UNITED STATES of America

v.

Gary BURRUSS.

No. 19877.

United States District Court
E. D. Pennsylvania.

Nov. 19, 1969.

Anthony List, U. S. Atty., Philadelphia, Pa., for plaintiff.

Jack Myers, Philadelphia, Pa., for defendant.

## OPINION

TROUTMAN, District Judge.

This matter appears before the Court upon defendant's timely motion for the return of seized property and the suppression of evidence pursuant to Rule 41(e), F.R.Cr.P., 18 U.S.C.A.

On October 30, 1968, the defendant was arrested at his apartment in Philadelphia by special agents of the Bureau of Narcotics and Dangerous Drugs and was charged with the unlawful sale and possession of drugs in violation of 21 U.S.C. § 331(q). By his motion to suppress, defendant contends that he was the victim of an unlawful arrest and an unlawful entry of his apartment and that as a result the special agents conducted an illegal search and seizure in violation of the guarantees of the Fourth Amendment. Defendant seeks suppression of the following items:

1. One tablet allegedly analyzed as S. T.P.

2. A small quantity of marijuana

3. One marijuana cigarette

4. A large quantity of identified Government funds used to make the alleged sale, including twenty dollars from an alleged prior sale involving other persons.

An evidentiary hearing upon the motion disclosed the following facts:

Theodore S. Handoga, a special Federal Narcotics Agent, and various other narcotics agents had made numerous purchases of dangerous drugs from one Philip Coran during a five-month period prior to October 30, 1968. Coran was not arrested during this period since it appears that the agents' primary concern was to locate and apprehend Coran's supplier.

On October 30, 1968, at about 4 P.M., Agent Handoga arranged with Philip Coran to purchase a quantity of S.T.P. tablets in the vicinity of the Grange Manor Apartments at Grange Street and Old York Road in Philadelphia. Prior notice of this pre-arranged "buy" was given to other agents who, while acting in an undercover capacity, kept Coran and Agent Handoga under surveillance. Some conversation took place between Coran and Agent Handoga in the agent's car parked outside the apartments to the effect that Agent Handoga should accompany Coran into the apartments to meet Coran's source of supply. When Coran rejected this suggestion, Agent Handoga refused to pay Coran for the drugs until Coran delivered them to him personally. Coran then went into the apartments and returned shortly thereafter with seventy tablets subsequently analyzed to be S.T.P. Agent Handoga then paid Coran with $400.00 in identified Government bills; Coran took the money and walked back to the apartments. Agent Handoga signalled the other agents that the buy had been completed. He related this in a conversation in his car to Agents Cassidy and Wilder who then followed after Coran into the apartments. Agent Becker was also in the apartment building attempting to locate Coran.

At first, Coran could not be located. However, Agent Cassidy heard a door open on the first floor and observed Philip Coran outside of Apartment A–1 "standing in the doorway talking to someone inside." After the conversation ended and the door closed, Agent Cassidy approached Coran, identified himself as a Federal Narcotics Agent and placed Coran under arrest. Agent Cassidy and Agent Becker, who had come from another part of the building, then brought Coran back to the door of the Apartment A–1. The entrance into defendant's apartment and his arrest is set forth in the following excerpt from Agent Cassidy's testimony at defendant's arraignment before the Commissioner:

"I asked him (Coran) to knock on the door of the apartment that he came out of, which he did. The door opened and inside was Gary Burruss * * *. Myself and another agent (Agent Becker) and Philip Coran were at the doorway. Burruss backed up very quickly and went for his right rear pocket with his hand. Agent

Becker * * * went after him and subdued him, as it appeared he was going to take something out of his pocket. He was placed under arrest.[1]

After the defendant was "subdued", the agents made a thorough search of his person and found a tear gas gun in his right rear pocket. A small quantity of marijuana about the size of a postage stamp and the identified Government bills were also found in the defendant's pockets. A complete search of the defendant's apartment was then conducted and one marijuana cigarette was found underneath a picture and one S.T.P. tablet was found elsewhere in the apartment.

Neither Agent Cassidy nor Agent Becker identified himself or his purpose prior to the time when the defendant opened his door in response to Coran's knock. However, as the agents came through the doorway to subdue the defendant they shouted "police". When the defendant was informed he was under arrest, the agents made a proper identification.

Defendant in effect makes three arguments before this Court: first, that his arrest and the ensuing search were unlawful because the arrest was made without probable cause; second, that the arrest and search were unlawful because the officers failed to state their identity and purpose before entering his apartment in violation of 18 U.S.C. § 3109; third, that, assuming his arrest to have been lawful, the search went beyond the permissible scope of a search "incident to a legal arrest".

*The Arrest*

 It is clear that the evidence at issue in order to be admissible must be the product of a search incident to a legal arrest since it is admitted here that the officers had neither an arrest war-

rant nor a search warrant. Federal Narcotics agents are authorized to arrest without a warrant pursuant to 26 U.S.C. § 7607(2) where "the violation is committed in the presence of the person making the arrest or where such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation." Reasonable grounds within the statute and probable cause are required by the Fourth Amendment to the United States Constitution are substantial equivalents. Ng Pui Yu v. United States, 352 F.2d 626 (9th Cir. 1965); Elkanich v. United States, 327 F.2d 417 (9th Cir.) cert. denied 377 U.S. 917, 84 S.Ct. 1182, 12 L.Ed.2d 186 (1964). The probable cause or reasonable grounds sufficient to authorize an arrest without a warrant exist where " 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790 (1925); Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). It is basic, therefore, that a warrantless arrest must stand on firmer grounds than mere suspicion. Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). However, this does not mean that the arresting officer must have evidence in hand which would be sufficient to convict. United States v. Rivera, 321 F.2d 704 (2d Cir. 1963). The quantum of evidence which would constitute probable cause can by no means become an inflexible rule, but rather, such must be measured by the facts of each particu-

---

1. It should be noted that the defendant did not personally appear at the suppression hearing before this Court, nor did he produce any witnesses in his behalf to contradict the testimony of the Government's witnesses. The defendant, how- ever, was ably represented by his own counsel at the hearing and did have the opportunity to cross-examine the Government witnesses. It is for this reason that we accept the Government's version of the facts in this case.

lar case. Carroll v. United States, *supra,* at 162, 45 S.Ct. at 280.

■ Turning to the facts of the instant case, we cannot agree with defendant's contention that his arrest was made without probable cause. Agents Cassidy and Becker were part of a surveillance team which personally observed the transaction between Philip Coran and Agent Handoga. From Agent Handoga's signal they could reasonably be aware that a sale of dangerous drugs had taken place. Furthermore, Agent Cassidy was personally informed by Agent Handoga that Coran was returning into the Grange Manor Apartments apparently to pay his supplier with the identified Government funds. This was their reason for following Coran into the building. Admittedly, the information given by Agent Handoga upon which the agents acted would be hearsay. However, probable cause may be predicated upon hearsay evidence as long as the source is known to be reliable. See Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); United States v. Nicholas, 319 F.2d 697 (2d Cir.) cert. denied 375 U.S. 933, 84 S.Ct. 337, 11 L.Ed.2d 265 (1963). We cannot say that the information given by Agent Handoga in these circumstances was so untrustworthy as to vitiate a finding of probable cause. Considering the prior knowledge at the agents' disposal when Philip Coran was observed leaving the defendant's apartment, we think it was reasonable to believe that Coran was there to pay his supplier, and that there were reasonable grounds for the agents to believe that the person inside that apartment had been a participant in an illegal sale of "dangerous drugs" to Philip Coran. When assessing probable cause it must be remembered that "as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, supra, 338 U.S. at 175, 69 S.Ct. at 1310. Noting these practical considerations, we believe that Agents Cassidy and Becker had probable cause to make the arrest.

■ It is further contended by the defendant that since the Narcotics Agents had Philip Coran under investigation for approximately five months, they had ample time to secure a warrant for the defendant's arrest. The fact, however, that *Coran* was under investigation for this period does not indicate that there was knowledge of the *defendant's* activities during this time. The testimony in fact indicates the contrary. It was stated in the suppression hearing that October 30, 1968, was the first time that the agents' investigation led them to a likely location of Coran's source of supply. The agents further expressed fear that the supplier would make the sale and flee the area or destroy any evidence he might have in his possession. We do not believe it was practical in the circumstances to obtain a warrant.

■ The defendant further argues that the officers did not know who was occupying the room before they made his arrest, citing Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948). However, it is clear that *Johnson* is inapposite to the issue of probable cause on the facts of the instant case. In *Johnson* it was conceded by the Government that the arresting officer did *not* have probable cause prior to entry into the apartment. The Court clearly stated that the arrest there was not based upon other reliable information apart from the identity of the defendant. In the instant case, however, other reliable information was in the possession of the agents that a narcotics violation had taken place, and it was upon this information that the officers acted. For the foregoing reasons we hold that the defendant's contentions are without merit and that his arrest was based upon probable cause.

### *The Method of Entry*

The defendant's second contention is that his arrest and the subsequent search and seizure are invalid because Agents

Cassidy and Becker failed to announce their identity and purpose before entering his apartment. Such a finding would render defendant's arrest unlawful and the fruits of the agents' search inadmissible in evidence. Section 3109 of the United States Code provides as follows:

> Section 3109. Breaking Doors or Windows for Entry or Exit
>
> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

Although the literal terms of Section 3109 speak only of entries under the authority of a warrant, the Supreme Court in Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) held that this statutory provision applies to arrests and searches made without warrants. Although the Court in *Miller* was faced with a forced entry through a defendant's doorway, the use of force has since been held not to be a necessary element to constitute a "breaking" within the terms of the statute. Sabbath v. United States, 391 U.S. 585, 589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968). The instant facts indicate that there was neither the use of force nor a *literal* breaking into defendant's apartment within the *Miller* or *Sabbath* decisions. Our facts show that the officers entered through the doorway after the defendant opened the door. Whether an unannounced entry through an open doorway constitutes a "breaking" within the meaning of Section 3109 has not been decided by the Third Circuit. Other Circuits have treated this issue, but have reached opposite conclusions. The Second, Seventh and Ninth Circuits respectively have held that a mere unannounced entry through an open doorway which is otherwise peaceful does not con-

stitute a "breaking" in violation of Section 3109. See United States v. Conti, 361 F.2d 153, 157 (2nd Cir. 1966); United States v. Rowlette, 397 F.2d 475, 478, 479 (7th Cir. 1968); Ng Puy Yu v. United States, 352 F.2d 626, 632 (9th Cir. 1965). On the other hand, the District of Columbia Circuit has held that an entry, whether or not peaceful, if unannounced, constitutes a "breaking" within the statute. See Hair v. United States, 110 U.S.App.D.C. 153, 289 F.2d 894 (1961); Keiningham v. United States, 109 U.S.App.D.C. 272, 287 F.2d 126 (1960). As to the ultimate resolution of this apparent conflict, it is important that we note the language of the United States Supreme Court in the *Sabbath* decision wherein Mr. Justice Marshall intimated the intended meaning and spirit of Section 3109:

> "[L]inguistic analysis seldom is adequate when a statute is designed to incorporate fundamental values and the ongoing development of the common law. * * * *An unannounced intrusion into a dwelling—what § 3109 basically proscribes*—is no less an unannounced intrusion whether officers break down a door, force open a chain lock on a partially opened door, open a locked door by use of a passkey, or, as here, open a closed but unlocked door. The protection afforded by, and the values inherent in, § 3109 must be 'governed by something more than the fortuitous circumstance of an unlocked door.' * * * *" 391 U.S. 589–590, 88 S.Ct. 1758. (Emphasis added)

The above language strongly suggests that the gravamen of a violation of Section 3109 is that the entry is unannounced rather than that it is peaceful. Although the Supreme Court has not specifically decided this point, we will assume, for the purposes of the instant case without deciding, that the unannounced entry by the Federal Narcotics Agents in the instant case constituted a violation of Section 3109.

██ However, our inquiry does not end here. Not every technical violation

of Section 3109 will result in holding that any ensuing arrest or search must be unlawful. Certain exceptions have been recognized where an announcement of identity and purpose would be either useless or dangerous. See Ker v. California, 374 U.S. 23, 39–40, 47, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962) and Sabbath v. United States, *supra,* 391 U.S. at 591 n. 8, 88 S.Ct. 1755. Where an announcement of identity and purpose may result in bodily harm or peril to the arresting officers, failure to make such announcement upon entry may be justified and excused. Gilbert v. United States, 366 F.2d 923 (9th Cir. 1966) cert. denied 388 U.S. 922, 87 S.Ct. 2123, 18 L.Ed.2d 1370 (1967). Such a failure may also be justified where there is good reason to believe that the person to be arrested is in possession of narcotic drugs which could be quickly and easily destroyed. See Ker v. California, *supra,* 374 U.S. at 40, 83 S.Ct. 1623.

 We believe that both circumstances are present in the instant case. From the information in the possession of Agents Cassidy and Becker at the time of making the arrest it was reasonable for them to believe that the defendant may have possessed narcotic drugs which could easily have been destroyed if the defendant had advance notice of their presence. But more important was the possibility of bodily harm or serious injury to the arresting officers. The facts show that as the defendant opened the door and saw the two officers he moved backwards and made a quick motion towards his right rear pocket in an apparent attempt to secure a weapon. Only then did Agent Becker proceed through the doorway to physically subdue the defendant. In such circumstances, we cannot say that it was unreasonable for Officer Becker to interpret the defendant's movements as giving rise to a fear of injury or bodily harm. To require the arresting officer in exigent circumstances such as these to stand fast at the doorway and announce his identity and purpose would be to require a useless and possibly dangerous act. On the facts of the instant case we, therefore, hold that an arresting officer need not give prior announcement of his identity and purpose in circumstances where to do so may reasonably lead to serious injury or bodily harm. We decide, therefore, that the defendant's arrest was not made unlawful by reason of the officers' failure to announce their identity and purpose before entering his apartment.

### The Search and Seizure

Defendant's third contention is that assuming his arrest to have been legal, the ensuing search went beyond the permissible limits of a search incident to a legal arrest. In part, we must agree. The defined limits of a search made incident to a legal arrest have been a product of an evolutionary judicial process. Most recently, in June of this year, the Supreme Court of the United States has explicitly set guidelines within which to judge the scope of a search incident to a legal arrest in the following language:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. *There is ample justification, therefore, for a search of the arrestee's person and the area "with his immediate control"—construing that phrase to mean the area from within*

*which he might gain possession of a weapon or destructible evidence.*

*There is no comparable justification, however, for routinely searching rooms other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself.* Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The "adherence to judicial processes" mandated by the Fourth Amendment requires no less. (Emphasis added)

Chimel v. California, 395 U.S. 752, 562–763, 89 S.Ct. 2034, 2040, 23 L.Ed. 2d 685 (1969)

■ Within these well-defined limits, it is clear that Agents Cassidy and Becker had the right to search the defendant's person for weapons and any evidence concealed upon his person. It follows, therefore, that the seizure of the tear-gas gun, the small quantity of marijuana and the identified Government bills found on the defendant's person were properly seized and are admissible in evidence against the defendant. It is equally clear that a complete search of the defendant's apartment was unjustified and that the results of that search must be suppressed. The testimony shows that the marijuana cigarette was found underneath a picture in the defendant's apartment. This implies that it was not in plain sight, but rather was in a "concealed area" in the apartment. There is nothing in the record which would refute this implication. The protections guaranteed by the Fourth Amendment demand that this evidence not be used against the defendant. It is further to be noted that the testimony at the suppression hearing does not indicate in what part of the apartment the S.T.P. tablet was found. As this search was conducted under an exception to the general rule requiring a warrant, the burden of producing facts to bring the search within the exception is upon the one invoking that exception.

Barnett v. United States 384 F.2d 848 (5th Cir. 1967); rehearing denied 391 F.2d 931 (5th Cir. 1967). Here, the Government must introduce facts to show that the S.T.P. tablet was within "the area into which an arrestee might reach in order to grab a weapon or evidentiary items". This burden has not been met. Consequently, we hold that the S. T.P. tablet found in the apartment must also be suppressed.

In conclusion, the items found on the defendant's person, namely, the tear-gas gun, the small quantity of marijuana and the identified Government bills are admissible in evidence against the defendant; the remaining items, namely, the marijuana cigarette, and the S.T.P. tablet may not be used in evidence.

## ORDER

And now, this 19th day of November, 1969, it is ordered that defendants' motion to suppress as it pertains to the marijuana cigarette and the S.T.P. tablet referred to herein is granted. It is further ordered that said motion to suppress as it pertains to the other items, namely, the tear-gas gun, the small quantity of marijuana and the identified Government bills, is denied.